**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **VPR OPERATING, LLC** *et al.*, | § | **CASE NO. 13-10599-TMD** |
| | § | **CHAPTER 11** |
| **DEBTORS.** | § | *(Jointly Administered)* |

## EMERGENCY MOTION TO APPOINT TRUSTEE

TO THE HONORABLE TONY M. DAVIS, UNITED STATES BANKRUPTCY JUDGE:

COMES NOW, The Official Committee of Creditors (hereinafter, the "Committee"), and files this Emergency Motion to Appointment Trustee and for Other Relief (the "Motion"), and in support thereof respectfully states as follows:

1.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the standing order of reference entered in the Western District of Texas. This matter is a core proceeding under 28 U.S.C. § 157. The appointment of a chapter 11 trustee is authorized under 11 U.S.C. § 1104(a)(1) and (2).

2.  Each of the Debtors in the above-styled and numbered bankruptcy cases (the "Bankruptcy Cases") continues to operate its business and manage its property as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

### Overview

3.  The President and C.E.O. of the Debtors has been held – in an apparently unrelated oil and gas case in this Court – to have defrauded investors and to have participated in forging documents. He was also held to have committed actual fraud, breached fiduciary duties, and caused willful and malicious injury to property. His liabilities were deemed non-dischargeable in his individual chapter 7 case pending in this Court. Pursuant to 11 U.S.C. § 1104(a)(1) and (2), the Committee moves to appoint a trustee to protect the interests of the estate.

## Background

### Pullen's Role in the Instant Case:

4.   Robert Pullen is the President and Chief Executive of VPR Corp.  Mr. Pullen is also the manager of VPR Operating, LLC, VPR (NM), LLC, and VPR (OK), LLC.  Mr. Pullen is the individual charged with ensuring compliance with the Debtors' duties and obligations as debtors-in-possession.  Mr. Pullen is also one of only two directors of VPR Corp. and one of only four employees of the Debtor.

### Pullen's Prior Oil and Gas and Personal Bankruptcies:

5.   It has come to the attention of the Committee that Mr. Pullen is simply not a suitable candidate to fulfill such duties and obligations.  In this regard, the Committee attaches hereto as *Exhibit A* certain Amended Findings of Fact and Conclusions of Law entered by **Judge Craig A. Gargotta** on **October 4, 2011**, in Adversary No. 04-1257; *C. Daniel Roberts v. Robert B. Pullen et al.* (the "Adversary").

6.   The Adversary relates to Mr. Pullen's individual chapter 7 bankruptcy case filed before this Court (Case No. 04-10771) as well as the chapter 7 bankruptcy case of Fidelity Land Company ("Fidelity") filed before this Court (Case No. 04-10772).   Mr. Pullen was a shareholder and vice president of Fidelity.

7.   The findings and conclusions made by Judge Gargotta in the Adversary regarding Mr. Pullen are, to say the very least, troubling given the fiduciary obligations owed by Mr. Pullen to the bankruptcy estates in the Bankruptcy Cases and given his control over the day-to-day operations and books and records of the Debtors.

8.   In the Adversary, Judge Gargotta made the following findings and conclusions regarding Mr. Pullen and his actions:

Lexus Energy Goldsmith Joint Venture ("Goldsmith JV"), Lexus Energy Osudo North Joint Venture ("Osudo North JV"), and Lexus Energy Flying "M" Joint Venture ("Flying M JV") are each joint ventures that were created for the exploration, discovery and production of oil and natural gas.

Goldsmith JV, Osudo JV and Flying M JV are sometimes referred to herein collectively as the "Joint Ventures." Lexus Energy Group, Inc. (Lexus) was the managing joint venturer for each of the Joint Ventures. J. Joel Pugh was the president of Lexus.

Fidelity Land Company ("Fidelity") was an oil and gas well operator. Robert B. Pullen ("Pullen") was a shareholder and Vice President of Fidelity. Kelly W. Hoffman ("Hoffman") was a shareholder and President of Fidelity.

Lexus and Fidelity executed a Lease Purchase and Exploration Agreement dated October 26, 2000, for the drilling of the Goldsmith Well in Ector County, Texas. Subsequently, Lexus formed the Goldsmith JV to fund the drilling of this well.

Lexus and Fidelity executed a Lease Purchase and Exploration Agreement dated January 1, 2001, for the drilling of the Osudo North Well in Lea County, New Mexico. Subsequently, Lexus formed the Osudo North JV to fund the drilling of this well.

Lexus and Fidelity executed a Lease Purchase and Exploration Agreement dated March 15, 2001, for the drilling of the Flying M Well in Lea County, New Mexico. Subsequently, Lexus formed the Flying M JV to fund the drilling of this well.

Each of the Lease Purchase and Exploration Agreements (collectively the "Exploration Agreements") contained virtually identical terms. Each of the Exploration Agreements provided that Fidelity was obligated among other things, to prepare each of the respective drill sites for drilling, to drill and test each of the respective wells, and, if appropriate, to complete and equip each of the respective wells.

Each of the Exploration Agreements was a turnkey contract, meaning that each contract was to be performed for a set price, regardless of cost overrun. Pursuant to the Exploration Agreements, Lexus, on behalf of the Joint Ventures paid Fidelity over $1,500,000.00 for drilling, testing and completion costs for these three wells.

The Joint Ventures were dissatisfied with the results achieved by Fidelity and sued Fidelity, Pullen and Hoffman.

3

**[Pullen's Misappropriations of Funds:]**

The Goldsmith JV well was drilled in January 2001 in Ector County, Texas, and completed on or about March 9, 2001. The Goldsmith JV well did generate revenues. As the operator of the Goldsmith JV well, Fidelity received revenues from that well in trust for the benefit of the Goldsmith JV. **As described below, Pullen caused Fidelity to distribute or pay out a portion of these funds in a manner inconsistent with the purpose for which they were delivered to Fidelity.**

The Flying M JV well was drilled in October 2001, in Lea County, New Mexico, and was completed in November 2001. From the beginning of production from the Flying M JV well, Fidelity withheld revenues owed to the Flying M JV to offset alleged costs incurred. **As the operator of the Flying M JV well, Fidelity received revenues from that well in trust for the benefit of the Goldsmith JV.**

**[Pullen's Misrepresentations Regarding Engineering Reports:]**

The Osudo North JV well was drilled in April 2001 in Lea County, New Mexico. In mid-April 2001, **Pullen represented to Lexus and the Osudo North JV that the targeted geological formations were hit, and that the Osudo North JV well looked good.** Pullen instructed Lexus on behalf of the Osudo North JV to send completion funds so that the well could be completed and placed on line for production.

**Based upon Pullen's representations and instructions, Lexus, on behalf of the Osudo North JV, paid to Fidelity $135,000.00 as the turnkey price for the completion of the Osudo North JV well.**

The Osudo North JV well was completed in July 2001; however, it yielded no recoverable amounts of oil or natural gas. In other words, the Osudo North JV well was a dry hole. Pullen sent Lexus on behalf of the Osudo North JV an AFE seeking approval to incur additional estimated costs for a re-completion of the Osudo North JV well in an effort to obtain production in commercial quantities. The re-completion work was not done on a turnkey basis.

In accordance with the AFE and as its portion of the AFE costs, the Osudo North JV paid Fidelity $38,604.50 for the re-completion.

The re-completion of the Osudo North JV well ended in January 2002. As before, the Osudo North JV well yielded no commercially viable amounts of oil or natural gas.

**As described more fully below, Pullen fraudulently induced the Osudo North JV into spending $173,604.50 for the completion and re-completion of the**

**Osudo North JV well, even though Pullen had actual knowledge that the well was a dry hole and should be plugged and**

**Pullen failed to disclose to the Joint Ventures that Fidelity was not licensed to be am operator in New Mexico and that the actual drilling and completion would be done by Trilogy Operation Company ("Trilogy").**

[**Pullen's Forgeries:**]

More specifically, Fidelity had subcontracted with Trilogy Operating Company ("Trilogy") to oversee all drilling activities relating to the Osudo North JV well. Pullen did not advise Lexus or the Osudo North JV that it had subcontracted with Trilogy. Trilogy sent daily drilling reports to Fidelity, advising Fidelity of the status of drilling operation. **Pullen received and reviewed the Trilogy reports and then, instead of immediately forwarding them, he altered the reports. Pullen, or someone acting pursuant to his instructions, deleted Trilogy's name from the drilling reports and inserted Fidelity's name, thereby passing off Trilogy's drilling reports as Fidelity's drilling reports.**

[**Pullen's Material, Factual Misrepresentations Regarding Engineering Reports:**]

**Even more egregious, however, was that Pullen altered a material, factual representation contained in one of Trilogy's reports, thereby rendering the report materially false and misleading. On a Trilogy drilling report dated April 15, 2001, Michael Mooney, a petroleum engineer and Fidelity's on-site supervisor for the Osudo North JV well, noted in the comments section of the report that there were "no shows." After both Pullen and Fidelity's geologist spoke with Mr. Mooney about the "no shows" comment, Pullen, or someone acting pursuant to his instructions, deleted the "no shows" comment, deleted Trilogy's name, added Fidelity's name, and sent the report to Lexus. Lexus, and thus the Osudo North JV, were unaware that Fidelity and Pullen had altered the Trilogy drilling reports.**

During the drilling of the Osudo North JV well, Mr. Mooney reviewed the mud logs. After the Osudo North JV well reached the targeted total depth on or about April 16, 2001, additional logs were taken allegedly to evaluate possible locations from which hydrocarbons might be recovered. These logs were reviewed by Mr. Mooney. **After reviewing the logs, Mr. Mooney advised Pullen and Fidelity that, based on the logs and his extensive experience in that particular field, there were no zones to complete the Osudo North JV well for production. Mr. Mooney further stated that completion should not be attempted, and requested instructions to plug and abandon the Osudo North JV well. Pullen rejected Mr. Mooney's recommendation, and instructed him to begin completion of the Osudo North JV well.**

5

Pullen did not advise the Osudo North JV or Lexus of this conversation, or of the "no shows" comment on Trilogy's April 15, 2001, drilling report. Instead, Pullen advised that completion should be attempted. At that time, Trilogy did not know that the Osudo North JV was the actual working-interest owner, and therefore did not contact it or Lexus directly with this information. Fidelity's initial attempt at completion of the Osudo North JV well cost the Osudo North JV $135,000.00.

Even after the failure of the Osudo North JV well, Pullen did not reveal either his conversations with Trilogy or the existence of the "no shows" comment in the April 15, 2001, drilling report. Instead, Pullen permitted Lexus on behalf of the Osudo North JV to contribute another $38,604.50 for a re-completion of the Osudo North JV well. The re-completion also failed to produce any marketable amounts of oil or natural gas.

Lexus and the Osudo North JV did not learn of the conversations between Trilogy and Pullen concerning the Osudo North JV well as a dry hole until March, 2002, and did not learn of the alteration of the "no shows" comment in the drilling report until after discovery commenced in the previously-filed state court cases.

Fidelity materially breached the terms of the Exploration Agreements.

An analysis of the bank accounts of Fidelity showed that the funds paid by the Joint Ventures with regard to Goldsmith Well, Osudo North Well and the Flying M well were commingled and not segregated by Fidelity.

**[Pullen's Distributions of Cash to Himself While the Debtor was Insolvent:]**

Between December 15, 2000, and June 14, 2002, Pullen authorized or allowed Fidelity to distribute to Hoffman a total of $259,494.93. During the same period of time, Pullen authorized or allowed Fidelity to distribute to Pullen a total of $252,178.87. During the same time period, Pullen caused or allowed Fidelity to distribute a total of $28,616.18 in payments to third parties for the benefit of Pullen and not for the benefit of Fidelity or the Joint Ventures. The total of these distributions is $540,289.98 (the "Fidelity Distributions"). All of the Fidelity Distributions were made at a time or times when the debts and obligations of Fidelity exceeded the value of its assets due to the obligations of Fidelity created by the terms of the Exploration Agreements.

**[Pullen's Breach of Fiduciary Duties:]**

As an officer and as a shareholder of Fidelity, Pullen owed fiduciary duties to Fidelity. Pullen breached these fiduciary duties by authorizing or allowing the Fidelity Distributions in the amount of $540,289.98.

[**Pullen's Fraud and Defalcations While a Fiduciary:**]

**Pullen committed fraud and defalcation while acting in a fiduciary capacity when he authorized or allowed the Fidelity Distributions in the amount of $540,289.98.**

[**Pullen's Conversions:**]

**Pullen wrongfully converted funds belonging to Fidelity in the amount of $540,289.98 (the Fidelity Distributions) with the subjective intent to cause injury, or in the alternative, his actions were substantially certain to cause injury.**

**The Bankruptcy Estate of Fidelity is entitled to judgment against Pullen in the amount of $540,289.98 (the Fidelity Distributions) for breaching their fiduciary duties, committing fraud and defalcation while acting as fiduciaries of Fidelity, and for wrongfully converting funds of Fidelity.**

[**Non-Dischargeable Judgment:**]

**The judgment against Pullen is non-dischargeable pursuant to 11 U.S.C. § 523(a)(4) because Pullen committed fraud or defalcation while acting in a fiduciary capacity.**

**The judgment against Pullen is also non-dischargeable pursuant to 11 U.S.C. § 523(a)(6) because it arises from a willful and malicious injury.**

See Exhibit "A" - Amended Findings of Fact and Conclusions of Law (emphasis added).

**Pullen's Selection by Victory Park in this Case:**

9.    The original findings of fact in the Adversary were that Pullen had acted along with Kelly W. Hoffman to defraud third parties.  Interestingly, Hoffman was previously an officer of the Debtors.  After the original findings were made by Judge Gargotta, Eric Taube, counsel to Victory Park, represented Mr. Hoffman to settle with Fidelity's bankruptcy trustee.  Following this settlement, the adverse findings and conclusions against Mr. Hoffman were removed.

10. The Committee does not, in any way, mean to imply that Mr. Taube played any role in Mr. Pullen's selection.  However there can be little doubt that Victory Park, as equity holder,

was or should have been aware, **before** **hiring** **him**, that Pullen had committed a laundry list of unlawful acts when he was installed as CEO and director.

11.  In light of these findings and conclusions by Judge Gargotta regarding Mr. Pullen, it is clear that it is not appropriate for Mr. Pullen to continue to manage and control the operations of the Debtors.  Instead, the Committee urges that the Court direct the United States Trustee to appoint a chapter 11 trustee to supervise and control the operations of the Debtors in these Bankruptcy Cases.

## Request for Relief

12.  Based upon the findings and conclusions of Judge Gargotta in the Adversary, it is clear that Mr. Pullen has a demonstrated history of the following acts and conduct that are entirely inconsistent with the duties and obligations of a debtor-in-possession:

- Falsification of documents;

- Alteration of documents;

- Concealment of material facts;

- Oral and written misstatement of material facts;

- Self-dealing;

- Misapplication of funds;

- Disregard of fiduciary duties;

- Breach of fiduciary duties;

- Actionable fraud;

- Willful injury to property; and

- Malicious injury to property.

13. Mr. Pullen is responsible for the evidentiary support for the Debtors' first day motions. Mr. Pullen will be responsible for the evidentiary support for the final hearings on the Debtors' pending motions for use of cash collateral and to approve debtor-in-possession financing. Presumably Mr. Pullen negotiated the terms of the DIP Loan. Mr. Pullen is in charge of making well operating decisions. Mr. Pullen owes fiduciary duties to the bankruptcy estates in these Bankruptcy Cases. Mr. Pullen is and will be responsible for directing the Debtors-in-Possession as they navigate their way through these chapter 11 proceedings. It is inconsistent with public policy and the policies and procedures of the Bankruptcy Code for Mr. Pullen to carry forward with these obligations. The Committee has no confidence in Mr. Pullen's ability to fulfill his fiduciary duties.

14. The Debtors are closely affiliated with their alleged secured creditors,[1] Victory Park Credit Opportunities Master Fund I, LLC and Victory Park Credit Opportunities, LP. Interestingly, the Debtors made strides to disguise these connections leading up to the filing of the Bankruptcy Cases, going so far as to formally remove the words "Victory Park" from their official corporate names just a few days before filing the Bankruptcy Cases. Then, in their bankruptcy petitions, VPR Corp., VPR (NM), LLC and VPR (OK), LLC each failed – as is expressly required by FED. R. BANKR. P. 1005 and the official bankruptcy petition form – to properly identify the fact that from the time of their formation until just a few days prior to filing the Bankruptcy Cases, these entities were formally named Victory Park Resources Corp., Victory Park Resources (NM), LLC and Victory Park Resources (OK), LLC. This fact is also not mentioned in the declaration filed by Mr. Pullen in connection with the Debtors' first day

---

[1] The Committee is investigating whether the alleged "debt" held by their Victory Park Credit affiliates should be factually and legally characterized as equity. The Committee reserves all rights in this regard.

motions.  Nor is Mr. Pullen's prior bankruptcy experience disclosed.  Thus, it appears Mr. Pullen is concealing material facts from creditors, just as he has done before.

15.  The Debtors and their alleged secured creditors/owners are attempting to place the Bankruptcy Cases on an extremely fast track.   The Debtors and their alleged secured creditors/owners are attempting to put into place DIP Financing under which the Debtors are virtually assured to default.[2]  Meanwhile, under the direction of Mr. Pullen and under the supervision of the Victory Park Credit group, who served on the board of directors of the Debtors until days before the Bankruptcy Cases were filed, the Debtors have incurred millions of dollars in unpaid prepetition trade debt that stands little chance of being paid in full under the Debtors' current scheme of rushing to sell their assets while stipulating to the validity, priority, and amount of their alleged secured creditors'/owners' claims.

16.  While a committee of creditors can attempt to maximize recoveries for the non-insider creditors, a committee will not be successful if the Debtors' management is acting in disregard (or worse, breach) of the duties owed to these bankruptcy estates.   Given Judge Gargotta's rulings regarding Mr. Pullen, the Committee believes a chapter 11 trustee must be appointed.

17.  Based upon the foregoing, the Committee moves for appointment of a trustee both for "cause" under 1104(a)(1) and because such appointment is in the best interests of creditors under 1104(a)(2).  Cause includes "fraud, dishonesty, incompetence or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case."  11 U.S.C. § 1104(a)(1).  With respect to whether a trustee should be appointed courts "eschew rigid absolutes and look […] to the practical realities and necessities." *In re Hotel*

---

[2] Mr. Pullen's First Day Affidavit claims "the Debtors and DIP Loan Lenders have negotiated the terms of the proposed DIP Loan at arm's length, and in good faith."

*Associates, Inc.*, 3 B.R. 343, 345 (Bankr. E.D.Pa. 1980). Among the factors considered are: (i) the trustworthiness of the debtor, *In re Evans*, 48 B.R. 46, 48 (Bankr. W.D.Tex. 1985); (ii) the debtor in possession's past and present performance and prospects for the debtor's rehabilitation, *In re Parker Grande Development, Inc.*, 64 B.R. 557, 561 (Bankr. S.D.Ind. 1986); In re L.S. Good & Co., 8 B.R. 312, 315 (Bankr. N.D.W.Va. 1980); (iii) the confidence -- or lack thereof -- of the business community and of creditors in present management, *In re Concord Coal Corp.*, 11 B.R. 552, 554 (Bankr. S.D.W.Va. 1981); and (iv) the benefits derived by the appointment of a trustee, balanced against the cost of the appointment, *In re Microwave Products of America, Inc.*, 102 B.R. 666, 675 (Bankr. W.D.Tenn. 1989).

18. The Committee submits that current management does not and cannot meet the standards required under the Bankruptcy Code.  The Committee does not have any confidence that Mr. Pullen can fulfill his duties to the creditors in this case.

WHEREFORE, PREMISES CONSIDERED, the Committee respectfully requests that the Bankruptcy Court grant this motion, order that the United States Trustee appoint a chapter 11 trustee, and request such other and further relief to which it may show itself to be justly entitled.

[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]

Respectfully submitted,

BROWN MCCARROLL, L.L.P.
111 Congress Ave., Suite 1400
Austin, Texas 78701
(512) 472-5456
(512) 479-1101 (Fax)
Email:  slemmon@brownmccarroll.com
Email:  kmercer@brownmccarroll.com


By:  */s/ Kell C. Mercer*
    Stephen W. Lemmon
    State Bar No. 12194500
    Kell C. Mercer
    State Bar No. 24007668

PROPOSED ATTORNEYS FOR
THE OFFICIAL COMMITTEE OF
CREDITORS

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of April, 2013, a true and correct copy of the foregoing pleading was served to all parties requesting notice via the Court's CM/ECF notification system, and on all parties on the attached service list.

    */s/ Kell C. Mercer*
    Kell C. Mercer