## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **VPR OPERATING, LLC, *et al.*;** | § | **Case No. 13-10599** |
| | § | |
| **Debtors.** | § | **Jointly Administered** |
| | § | |

## DECLARATION OF MICHAEL SCHMIDT IN SUPPORT OF THE DEBTORS' APPLICATION FOR APPROVAL OF THE EMPLOYMENT OF GLOBAL HUNTER SECURITIES, LLC, *NUNC PRO TUNC* TO THE PETITION DATE, AS FINANCIAL ADVISOR AND INVESTMENT BANKER FOR THE DEBTORS

I, Michael Schmidt, hereby declare as follows:

1.      I am over the age of twenty-one (21) and am competent and authorized to make this Declaration.  Unless otherwise stated in this Declaration, I have personal knowledge of the facts set forth herein.

2.      I am a managing director with Global Hunter Securities, LLC (together with its wholly owned subsidiaries, agents, independent contractors and employees, "Global Hunter"). VPR Operating, LLC ("VPR"), VPR (OK), LLC ("VPROK"), VPR (NM), LLC ("VPRNM"), and VPR Corp. ("VPRC") (collectively, the "Debtors"), have requested that Global Hunter provide investment banking and advisory services to them in their respective bankruptcy proceedings.  This Declaration is being submitted in connection with the *Debtors' Application for Approval of the Employment of Global Hunter Securities, LLC, Nunc Pro Tunc to the Petition Date, as Financial Advisor and Investment Banker for the Debtors* (the "Application").

**Global Hunter's Disinterestedness**

3.      After due diligence, and except as set forth below, insofar as I have been able to ascertain, and to the best of my knowledge, Global Hunter and each of its professionals:

(a)      is not a creditor, equity security holder or insider of the Debtors and does not represent any entity (or its attorneys or accountants) other than the Debtors in connection with the Debtors' chapter 11 cases;

(b)      is not, and was not within the past two years, a director, officer, or employee of any of the Debtors;

(c)      has no interests materially adverse to the interests of the Debtors or of any class of creditors or equity security holders of the Debtors, by reason of any direct or indirect relationship to, connection with, or interests in, the Debtors; and

(d)      does not hold or represent any interests adverse to the estates, is a disinterested person, and is eligible to be employed by the Debtors under Bankruptcy Code §§ 327(a) and 328(a).

4.      I have had an opportunity to review the Debtors' books and records and identify additional parties in interest in these cases for purposes of a conflicts check.  Under my supervision, Global Hunter has conducted a review of those parties listed on Exhibit A attached hereto to determine if any of them are present or recent former clients of Global Hunter.  Upon such review, Global Hunter found that it is involved in matters, unrelated to these proceedings, with certain potential creditors of the Debtors.  A summary of such relationships that Global Hunter identified during this process is set forth on Exhibit B to this Declaration.  Global Hunter currently serves these clients in matters unrelated to the Debtors and these proceedings.  The matters involving those clients do not relate in any way to the Debtors or these proceedings, nor do I believe that Global Hunter's representation of those clients in any way conflicts with the services that Global Hunter will provide to the Debtors in these cases.

5.     As  part of its diverse practice, Global Hunter appears in numerous cases, proceedings and transactions that involve many different professionals, including attorneys, accountants and financial consultants, who may represent claimants and parties-in-interest in the Debtors' chapter 11 cases. Also, Global Hunter has performed in the past, and may perform in the future, services for various attorneys and law firms, and has been represented by several attorneys and law firms, some of whom may be involved in these proceedings.  In addition, Global Hunter has previously worked, may currently work, and will likely in the future be working with or against other professionals involved in these cases in matters unrelated to the Debtors and these cases.  Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtors in matters upon which Global Hunter is to be employed, and none are in connection with these cases.

6.     Additionally, Global Hunter, through the equity owners of its parent company, GHSHC, LLC, has indirect affiliate relationships with numerous investment banking institutions located worldwide (the "Affiliated Entities").  None of the Affiliated Entities is being retained hereunder nor will any professionals or employees of the Affiliated Entities provide services to the Debtors in connection with the matters contemplated hereby.  The Affiliated Entities are involved in a wide range of investment banking and other activities.  Global Hunter can make no representation as to the "disinterestedness" (as defined in the Bankruptcy Code) of the professionals or employees of the Affiliated Entities.  Information that is held by the Affiliated Entities will not for any purpose be taken into account in determining Global Hunter's responsibilities to the Debtors herein.  None of the Affiliated Entities will have any duty to disclose to the Debtors or any party, or utilize for the Debtors' benefit, any non-public

information acquired in the course of providing services to any other person engaging in any transaction or otherwise carrying on its business.

7.     Global Hunter may solicit one or more of the creditors or other interested parties involved in these cases to invest or provide financing to the Debtors, debtors in other cases, or other parties and be involved in such transactions which may follow from such solicitations. Global Hunter does not perceive such involvements as a conflict.

8.     The matters disclosed herein have been identified by Global Hunter using its reasonable efforts.  Global Hunter will periodically review its files during the pendency of the Debtors' cases to ensure that no conflicts or other disqualifying circumstances exist or arise.  If any new or relevant facts or relationships are discovered or arise, Global Hunter will use reasonable efforts to identify such further developments and will promptly file a supplement to this Declaration.

9.     If the Court approves the Debtors' proposed employment of Global Hunter, Global Hunter will not accept any engagement or perform any services in these cases for any entity or person other than the Debtors, without first obtaining leave of this Court.  However, Global Hunter will continue to provide professional services to entities or persons that may be creditors of the Debtors or interested parties in these cases, so long as such services do not relate to, or have any direct connection with, the Debtors' bankruptcy proceedings.

**Global Hunter's Compensation Arrangement**

10.     On or about April 18, 2013, the Debtors and Global Hunter entered into an agreement, (the "Engagement Agreement"), under which Global Hunter agreed to serve as the Debtors' financial advisor and investment banker.   A true and correct copy of the Engagement Agreement is attached hereto as Exhibit C.  Subject to Court approval and in accordance with

Bankruptcy Code Section 328(a), compensation will be payable to Global Hunter as specified in the Engagement Agreement. I am familiar with the Engagement Agreement and am competent to give testimony concerning its contents.

     11.    As more fully described in the Engagement Agreement, in consideration of the services furnished by Global Hunter, Global Hunter will receive compensation as follows:

    a.  An initial advisory fee of $65,000, payable upon Court approval of Global Hunter's employment;

    b.  Upon the closing of a M&A Transaction (as that term is defined in the Engagement Agreement), a M&A fee (the "M&A Fee") equal to two and a half percent (2.5%) of the aggregate consideration received in connection with such M&A Transaction, payable at the closing of such M&A Transaction. If the M&A transaction involves multiple sales of portions of the Debtors' assets, the M&A Fee for any one sale shall be the greater of (i) two and a half percent (2.5%) of the aggregate consideration for such sale; or (ii) $200,000; provided, however, that if three or more sales are consummated, the total amount of M&A Fees payable shall be capped at the greater of (x) two and a half percent (2.5%) of the aggregate consideration for all such sales, or (y) $600,000 for all of the M&A Transactions consummated;

    c.  A new capital fee (the "New Capital Fee") equal to three percent (3.0%) for any unsecured or junior debt, one percent (1.0%) for any senior secured debt and six percent (6.0%) for any equity or convertible securities, all computed as a percentage of the gross cash proceeds raised in the case of equity, or the principal amount raised in the case of debt;

    d.  In the case of any other transaction or recapitalization, whether specifically described or not, including, but not limited to, a "credit bid" by secured lenders, a minimum fee (the "Minimum Fee") in the amount of $400,000; provided, however, that the Minimum Fee would only be payable if the M&A Fee and/or New Capital Fee were not otherwise earned and payable; and

    e.  Reimbursement of all reasonable, out-of-pocket expenses in an amount not to exceed $100,000 in the aggregate.

     12.    The Engagement Agreement also provides that, upon the Court's approval of Global Hunter's employment, the Debtors will provide Global Hunter with a $25,000 advance against expenses subject to reimbursement under the Engagement Agreement.

13.    Additionally, as set forth in Exhibit A to the Engagement Agreement, Global Hunter and its affiliates will be indemnified and held harmless, to the fullest extent permitted by law, from and against any losses, claims, damages, liabilities, costs and expenses (including Global Hunter's attorneys' fees) arising out of or relating to Global Hunter's employment by the Debtors, other than losses relating primarily to Global Hunter's fraudulent acts, willful misconduct or gross negligence.   These indemnification provisions were fully negotiated between the Debtors and Global Hunter at arms' length.

14.    Notwithstanding anything within this Declaration or the Application, the Engagement Agreement shall control the complete terms of Global Hunter's compensation.

15.    Because Global Hunter's professionals do not maintain time records in connection with the provision of their services, Global Hunter will not maintain time records in connection with the provision of services to the Debtors under the Engagement Agreement.

16.    Based on its experience and independent analysis, Global Hunter believes that the fees and compensation sought in the Engagement Agreement are fair and reasonable under the standards set forth in section 328 of the Bankruptcy Code.  Global Hunter believes that the fees appropriately reflect:  (i) the nature and the scope of services to be provided by Global Hunter, (ii) Global Hunter's substantial experience in similar matters, and (iii) the fee structures typically used by Global Hunter and other leading investment bankers, which do not customarily bill their clients on an hourly basis.

17.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 26th of April, 2013.

_____
Michael H. Schmidt

GARY EDWARD MERINGER
NOTARY PUBLIC
NOTARY PUBLIC ID # 89480
MY COMMISSION IS FOR LIFE.
STATE OF LOUISIANA

4836-5251-6371.

**<u>Schmidt Declaration – Exhibit A</u>**

In re VPR Operating, LLC, *et al*.
Case No. 13-10599
US Bankruptcy Court - WD Texas

**List of Parties for Conflict Checks**

| Party Name and Address |
|---|
| Pinpoint Drilling & Directional Services LLC PO BOX 204093 Houston, TX 77216-4093 |
| Universal Pressure Pumping Inc 4510 Lamesa Highway Snyder, TX 79549 |
| PROPETRO SERVICES, INC. 1706 SOUTH MIDKIFF ROAD BUILDING B MIDLAND, TX 79701 |
| Stemcor AG 8505 Technology Forest Place Suite 401 The Woodlands, TX 77381 |
| Professional Directional Enterprises, Inc. P.O. Box 677457 Dallas, TX 75267-7457 |
| NW OIL SERVICES, LLC 900 KASTRIN ST EL PASO, TX 79907 |
| TESCO CORPORATION (US) 3993 W. SAM HOUSTON PKWY. N., SUITE 100 HOUSTON, TX 77043 |
| TanMar Rentals LLC PO BOX 1376 Eunice, LA 70535 |
| Oil States Energy Services 1600 W. Highway 6, Ste. 418 Alvin, TX 77511 |
| PAR FIVE ENERGY SERVICES, LLC PO BOX 993 ARTESIA, NM 88211 |
| Tiger of the North Transportation, LLC 1614 N Gulf Street Hobbs, NM 88240 |
| The Artesia Lumber Co. P.O. Box 5564 Midland, TX 79704 |
| Gandy Corporation P.O. Box 2140 Lovington, NM 88260 |
| Oil Dog Pipe Rentals P.O. Box 4545 Midland, TX 79704 |

| |
|---|
| EMS USA, INC<br>2000 BERING DRIVE, SUITE 600<br>HOUSTON, TX 77057 |
| PATTERSON SERVICES, INC.<br>8032 MAIN ST.<br>HOUMA, LA 70360 |
| Choice Oilfield Service<br>P O Box 337<br>Lovington, NM 88260 |
| DE LA SIERRA TRUCKING INC.<br>3116 ROSE ROAD<br>HOBBS, NM 88242 |
| EUNICE WELL SERVICING, INC<br>PO BOX 1500<br>HOBBS, NM 88241 |
| ABC Rental Tool Co.<br>DBA CAVALOZ ENERGY INC.<br>P.O. Box 1500<br>Hobbs, NM 88241 |
| Mico Rentals, LLC<br>P.O. Box 128<br>Lovington, TX 88260 |
| THOMAS ENERGY SERVICES, LLC<br>THOMAS TOOLS,A SCHLUMBERGER CO<br>PO BOX 12134<br>NEW IBERIA, LA 70562 |
| WILBANKS TRUCKING, INC.<br>PO BOX 1390<br>ARTESIA, NM 88211 |
| ZNERGEN OPERATING, LLC<br>PO BOX 3611<br>BIG SPRING, TX 79720 |
| BAKER HUGHES OILFIELD, INC.<br>2105 Market Street<br>Midland, TX 79703 |
| COSI ENERGY SERVICES LLC<br>4311 SO. CO. RD 1298<br>P.O. BOX 61994<br>MIDLAND, TX 79711 |
| Schlumberger Technology Corp<br>P O Box 201556<br>Houston, TX 77216-1556 |
| KNIGHT OIL TOOLS, LLC<br>DBA KNIGHT FISHING SERVICES<br>P.O. BOX 52688<br>LAFAYETTE, LA 70505 |
| MICO SERVICES, LLC<br>PULLING & SWABBING UNITS<br>PO BOX 147<br>LOVINGTON, NM 88260 |
| MICO OILFIELD SERVICES, LLC<br>TRUCKING<br>PO BOX 158<br>LOVINGTON, NM 88260 |

Onyx Contractors Operations LP
P. O. Box 60547
Midland, TX 79711

SMITH INTERNATIONAL, INC.
A DIV OF SCHLUMBERGE
PO BOX 200760
DALLAS, TX 75320-0760

Delfinco, LP
510 Fehley Drive
King of Prussia, PA 19406

Victory Park Credit Opportunities, LP
Attn:  Scott R. Zemnick
227 W. Monroe Street, Suite 3900
Chicago, IL 60606

Victory Park Management, LLC
Attn:  Scott R. Zemnick
227 W. Monroe Street, Suite 3900
Chicago, IL 60606

Hohmann, Taube & Summers, LLP
c/o Eric Taube
100 Congress Ave, 18th Floor
Austin, TX 78791

Cozen O'Connor LLP
c/o John T. Carroll III
1201 N. Market Street, Suite 1001
Wilmington, DE 19801

Brown McCarroll LLP
Attn: Stephen Lemmon
111 Congress Ave, Suite 1400
Austin, TX 78701

Office of the United States Trustee
Attn:  Deborah A. Bynum
903 San Jacinto, Suite 230
Austin, TX 78701

VPR Operating, LLC
1406 Camp Craft Road, Suite 106
Austin, TX 78746

VPR (NM), LLC
1406 Camp Craft Road, Suite 106
Austin, TX 78746

VPR (OK), LLC
1406 Camp Craft Road, Suite 106
Austin, TX 78746

VPR Corp.
1406 Camp Craft Road, Suite 106
Austin, TX 78746

Robert (Bob) Pullen
1406 Camp Craft Road, Suite 106
Austin, TX 78746

Patton Boggs LLP
2000 McKinney Ave, Suite 1700
Dallas, TX 75201

| |
|---|
| Patton Boggs LLP<br>2550 M Street NW<br>Washington, DC 20037 |
| Kane Russell Coleman & Logan, PC<br>Attn Robert Taylor<br>1601 Elm Street, Suite 3700<br>Dallas, TX 75201 |
| Dore Law Group<br>Attn:  Carl Dore, Jr.<br>17171 Park Row, Suite 160<br>Houston, TX 77084 |
| Gray Wireline Service, Inc.<br>PO Box 209045<br>Dallas, TX 75320-9045 |
| Crady, Jewett & McCulley LLP<br>Attn:  William R. Sudela<br>2727 Allen Parkway, Suite 1700<br>Houston, TX 77019 |
| Davis, Gerald & Creamer<br>Attn:  David H.Smith<br>P.O. Box 2796<br>Midland, TX 79702 |
| Snow Spence Green LLP<br>Attn:  Phil F. Snow<br>2929 Allen Parkway, Suite 4100<br>Houston, TX 77019 |
| Schlumberger Technology Corp.<br>1325 South Dairy Ashford<br>Houston, TX 77077 |
| Baker & Hostetler LLP<br>303 E. 17th Ave, No 1100<br>Denver, CO 80203 |
| Kemp Smith LLP<br>Attn:  James W. Brewer<br>P.O. Box 2800<br>El Paso, TX 79999 |
| Kelly Hart & Hallman LLP<br>Attn: Stephanie E. Kaiser<br>201 Main Street, Suite 2500<br>Fort Worth, TX 76102 |
| Law Offices of Jay H. Dushkin<br>Attn:  Jay H. Dushkin<br>4615 Southwest Freeway, Suite 600<br>Houston, TX 77027 |
| Craig H. Cavalier<br>P.O. Box 270565<br>Houston, TX 77277 |
| Kay D. Brock<br>Travis County Attorney<br>P.O. Box 1748<br>Austin, TX 78767 |

| |
|---|
| Wright Ginsberg Brusilow P.C.<br>Attn: C. Ashley Ellis<br>14755 Preston Road, Suite 600<br>Dallas, TX 75254 |
| Sundance Services Inc<br>P O Box 1737<br>Eunice, NM 88231 |
| Stephen H. Nickey, P.C.<br>1201 N. Mesa, Suite B<br>El Paso, TX 79902 |
| Diamond McCarthy LLP<br>Attn: Jason M. Rudd<br>909 Fannin Street, 15th Floor<br>Houston, TX 77010 |
| Louis Puccini, Jr.<br>P.O. Box 50700<br>Albuquerque, NM 87181 |
| Shanks Mudlogging<br>P.O. Box 1179<br>Carlsbad, NM 88220 |
| Hobbs Rental Corp.<br>P.O. Box 3435<br>Hobbs, NM 88241 |
| Vasquez Trucking, Inc.<br>1215 Ave. K<br>Lovington, NM 88260 |
| Magma Resources, LLC<br>P.O. Box 237<br>Paoli, OK 73074 |
| ELITE WELL SERVICES LLC<br>2702 N FREEMAN<br>P.O. BOX 1426<br>ARTESIA, NM 88211-0426 |

**<u>Schmidt Declaration – Exhibit B</u>**

**Exhibit B**

GHS relationships with parties listed on Exhibit A are as follows:

Our research department  provides research coverage on Baker Hughes, Patterson, Schlumberger and Oil States.  We are not compensated by any of these companies for this service.

We have talked to Oil States and Knight Oil  Tools about possibly undertaking an investment banking assignment for them.  Nothing has transpired thus far.

From time to time, we have presented various investment opportunities to Victory Park Capital.

## Schmidt Declaration – Exhibit C



**GHS**
GLOBAL HUNTER SECURITIES

April 18, 2013

***Confidential***
Mr. Robert Pullen
VPR Operating, LLC
1406 Camp Craft Road, Suite 106
Austin, TX 78746

Mr. Pullen:

This letter (the "***Agreement***") will serve to confirm the terms and conditions of the agreement by and among VPR Operating, LLC (including its controlled affiliates, successors and assigns, the "***Company***"), and Global Hunter Securities, LLC ("***GHS***"), regarding the retention of GHS as financial advisor and investment banker to the Company in its pending Chapter 11 proceeding in the United States Bankruptcy Court for the Western District of Texas (the "***Bankruptcy Court***") to assist the Company with any New Capital Raise and/or M&A Transaction (each as defined below and collectively, a "***Transaction***").

<u>Section 1. Services to be Rendered</u>.

In connection with the formulation, analysis and implementation of various options for a Transaction or any series or combination of Transactions, GHS will perform the following services and as requested by the Company:

(a)  Review and analyze the Company's business and financial projections;

(b)  Evaluate the Company's strategic and financial alternatives;

(c)  Assist the Company in evaluating, structuring, negotiating and implementing potential Transactions;

(d)  Assist the Company in preparing descriptive material to be provided to potential parties that might participate in potential Transactions;

(e)  Develop, update and review with the Company on an ongoing basis a list of parties that might participate in potential Transactions;

(f)  Contact potential parties to potential Transactions;

(g)  Assist the Company with evaluating potential term sheets, indications of interest, letters of intent and other Transaction agreements;

(h)  Assist the Company in negotiating agreements and definitive contracts;

4831-5902-9267.

(i)   Assist the Company in obtaining approval from the Bankruptcy Court of the Transaction, including, without limitation, providing testimony and/or other evidence of any or all of the services provided by GHS to the Company, including, but not limited to, the steps taken by GHS in contacting potential interested parties and/or evaluating, structuring, negotiating and implementing potential Transactions; and

(j)   Perform other such services as GHS and the Company shall mutually agree in a separate writing.

In performing its services pursuant to this Agreement, and notwithstanding anything to the contrary herein, GHS is not assuming any obligation or responsibility for: the Company's decision to pursue (or not to pursue) any business strategy, or to effect (or not to effect) any Transaction; nor designing or implementing operating, organizational, administrative, cash management or liquidity improvements. In addition, notwithstanding anything to the contrary herein, GHS shall not have any obligation or responsibility to provide: accounting, audit, and "crisis management" or business consultant services to the Company; nor any valuation opinions or any advice or opinions with respect to solvency in connection with any Transaction.

As used herein, *"New Capital Raise"* shall mean, whether pursuant to a Plan, motion or otherwise in any Bankruptcy Case under title 11 of the United States Code (a *"Bankruptcy Case"*), or whether outside of a Bankruptcy Case under title 11 of the United States Code (the *"Bankruptcy Code"*), any new capital, in the form of a private or public placement of securities of the Company and/or any controlled affiliate or subsidiary thereof, in one or more related transactions, to one or more investors and/or sources of financing, in the form of debt securities (including bank debt), common stock, convertible preferred stock, convertible debt securities, preferred stock, equity-linked securities, equity or equity-linked joint ventures or other equity or equity-linked arrangements.

As used herein, *"M&A Transaction"* shall mean, whether pursuant to a Plan, motion or otherwise in any Bankruptcy Case,  or whether outside of a Bankruptcy Case, any one or more of the following: (a) any merger, consolidation, reorganization, recapitalization, financing, refinancing, business combination or other transaction pursuant to which the Company (or control thereof) is acquired by, or combined with, any person, group of persons, partnership, corporation or other entity (an *"Acquiror"*), (b) any acquisition, directly or indirectly, by an Acquiror (or by one or more persons acting together with an Acquiror pursuant to a written agreement or otherwise), whether in a single transaction, multiple transactions or a series of transactions, of (i) other than in the ordinary course of business, any material portion of the assets, business or operations of the Company or (ii) any outstanding or newly-issued shares of the Company's capital stock or any securities convertible into, or options, warrants or other rights to acquire such capital stock or other equity securities of the Company, for the purpose of effecting, participating in or pursuing a recapitalization or change of control of the Company or (c) any transaction similar to any of the foregoing.

As used herein, *"Credit Bid"* shall mean any M&A Transaction in which the consideration includes a credit or other bid involving consideration other than cash, in whole or in part, such as pre- and post-petition loans, trade claims, leases, other outstanding pre- and post-petition indebtedness or other non-cash consideration.

As used herein, "*Lenders*" shall mean Victory Park Management, LLC , Delfinco, LP, and Victory Park Credit Opportunities, LP, or any affiliates thereof, and any counsel, advisor or authorized agent of

April 11, 2013 DRAFT
Page 3 of 14

Victory Park Management, LLC , Delfinco, LP, and Victory Park Credit Opportunities, LP or any affiliates thereof.

As used herein, "**Committee**" shall mean the Official Committee of Creditors appointed in the Bankruptcy Case, and any counsel, advisor or authorized agent of the Official Committee of Creditors.

Section  2.  Information Provided by the Company.

(a)     The Company understands and agrees that the services to be rendered by GHS pursuant to Section 1 of this Agreement and the advice, whether formal or informal, relating thereto are solely for the benefit and use of the Company. The Company agrees that any reports, recommendations or opinions, which are provided to the Company in the context of this engagement, shall not be summarized, excerpted from, disclosed publicly, made available to third parties (other than the Company and its subsidiaries' boards of directors and the Company's advisors and counsel, and the Lenders and/or Committee, each of whom agree to be bound by the provisions of this Section 2(a)) or otherwise referred to, in whole or in part, without the prior written consent of GHS. Any reference to GHS in a press release shall be submitted to GHS for its approval prior to the distribution or dissemination thereof.

(b)     The Company will cooperate with GHS and furnish to, or cause to be furnished to, GHS any and all information as GHS deems appropriate to enable GHS to render services hereunder (all such information being the "**Information**"). The Company recognizes and confirms that GHS (i) will use and rely solely on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without having assumed any obligation to verify independently the same; (ii) does not assume responsibility for the accuracy or completeness of the Information and such other information; and (iii) will not act in the official capacity of an appraiser of specific assets of the Company or any other party.  The Company confirms that the information to be furnished by the Company, when delivered will be true and correct in all material respects, will be prepared in good faith, and will not contain any known material misstatement of fact or knowingly omit to state any material fact. The Company will promptly notify GHS if it learns of any material inaccuracy or misstatement in, or material omission from, any Information theretofore delivered to GHS.

(c)     The Company acknowledges that in the course of this engagement it may be necessary for GHS and the Company to communicate electronically. The Company further acknowledges that although GHS will use commercially reasonable procedures to check for the most commonly known viruses and to ensure accuracy of such information and communications, the electronic transmission of information cannot be guaranteed to be secure or error-free. Furthermore, such information could be intercepted, corrupted, lost, destroyed, arrive late or incomplete or otherwise be adversely affected or unsafe to use. Accordingly, the Company agrees that, to the extent GHS utilizes such commercially reasonable procedures, GHS shall have no liability to the Company with respect to any error or omission arising from or in connection with (i) the electronic communication of information to the Company or (ii) the Company's reliance on such information.

4831-5902-9267.

April 11, 2013 DRAFT
Page 4 of 14

Section 3. Bankruptcy Application for Retention of GHS.

As the Company has commenced a Bankruptcy Case, upon signing of this agreement, the Company shall promptly file an application with the Bankruptcy Court, pursuant to §§ 327(a) and 328(a) of the Bankruptcy Code, Rule 2014 of the Federal Rules of Bankruptcy Procedure, applicable local rules and procedural orders of the Bankruptcy Court and procedural guidelines established by the Office of the United States Trustee, for approval of (a) this Agreement and (b) GHS' retention by the Company under the terms of this Agreement (including, without limitation, the reimbursement of the fees, disbursements and other charges of GHS' counsel pursuant to Section 6 hereof without the requirement that the retention of such counsel be approved by the Bankruptcy Court), *nunc pro tunc* to the date the Bankruptcy Case was commenced (the "***Filing Date***"), and shall use its best efforts to obtain Bankruptcy Court authorization thereof. The Company shall use its best efforts to obtain such Bankruptcy Court approval and authorization subject only to the subsequent review by the Bankruptcy Court under the standard of review provided in §328(a) of the Bankruptcy Code and not subject to the standard of review set forth in § 330 of the Bankruptcy Code. The Company shall supply GHS and its counsel with a draft of such application and any proposed order authorizing GHS' retention sufficiently in advance of the filing of such application and proposed order to enable GHS and its counsel to review and comment thereon. GHS shall have no obligation to provide any services under this Agreement unless GHS' retention under the terms of this Agreement is approved in the manner set forth above by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which order is acceptable to GHS in all respects ("***Retention Order***").

GHS acknowledges that in the event that the Bankruptcy Court approves its retention by the Company pursuant to the application process described in this Section 3, payment of GHS' fees and expenses shall be subject to (i) the jurisdiction and approval of the Bankruptcy Court under § 328(a) of the Bankruptcy Code and the Retention Order; (ii) any applicable fee and expense guidelines and/or orders; and (iii) any requirements governing interim and final fee applications. GHS shall have no obligation to keep time records except as it does so in its normal practice and will have no obligation to provide services under this Agreement if it will be required to vary its normal time-keeping practices. In the event that GHS' engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of GHS hereunder as promptly as practicable in accordance with the terms hereof and the orders governing interim and final fee applications, and after obtaining all necessary further approvals from the Bankruptcy Court, if any; provided, however, that the Company shall provide (including the filing of any necessary motions sufficiently in advance of the closing of any Transaction or similar transaction, or confirmation and effectiveness of a Plan) for the payment of the fees set forth in Sections 4 (b) and (c) hereof to GHS simultaneously with the closing of any Transaction to which such fee relates. The Company agrees to support GHS' fee applications during any Bankruptcy Court hearing on such fee applications, so long as the fees and expenses sought by GHS therein are those fees and expenses set forth in this Agreement.

In agreeing to seek GHS' retention under § 328(a) of the Bankruptcy Code, the Company acknowledges that it believes that GHS' general restructuring experience and expertise, its knowledge of the capital markets and its merger & acquisition capabilities will inure to the benefit of the Company, that the value to the Company of GHS' services hereunder derives in substantial part from that expertise and experience and that, accordingly, the structure and amount of the Advisory Fee, the New Capital Fee, and the M&A Fee (each as defined below), are reasonable regardless of the number of hours to be expended by GHS' professionals in performance of the services provided hereunder.

4831-5902-9267.

April 11, 2013 DRAFT
Page 5 of 14

<u>Section  4.  Fees to GHS</u>.

As compensation for the services rendered hereunder, the Company, and its successors, if any, agree to pay GHS each of the following fees, payable in cash:

(a)     An initial advisory fee (the "***Advisory Fee***") of $65,000.00 payable upon execution and approval by the Bankruptcy Court of this Agreement as provided in Section 3 hereof;

(b)     A M&A fee (the "***M&A Fee***") equal to two and a half percent (2.5%) of the Aggregate Consideration (as defined below) received in connection with such M&A Transaction, which fee shall be payable at the closing of any M&A Transaction. In the case of sales of only portions of the Company's assets, the M&A Fee for any one sale shall be the greater of (i) two and a half percent (2.5%) of the Aggregate Consideration for such sale or (ii) $200,000.00; provided, however, if three (3) or more sales of portions of the Company's assets are consummated, the total amount of M&A Fees shall be capped at the greater of (x) two and a half percent (2.5%) of the Aggregate Consideration for all such sales, or (y) $600,000.00 for all of the M&A Transactions consummated.

(c)     A new capital fee (the "***New Capital Fee***") equal to three percent (3.0%) for any unsecured or junior debt, one percent (1.0%) for any senior secured debt and six percent (6%) for any equity or convertible securities, all computed as a percentage of the gross cash proceeds raised in the case of equity, or the principal amount raised in the case of debt, of any New Capital Raise; and

(d)     In the case of any other transaction or recapitalization, whether specifically described or not within this agreement, including, but not limited to a Credit Bid by secured lenders, a minimum fee (the "***Minimum Fee***") in the amount of $400,000.00; provided, however, the Minimum Fee would only be payable if the M&A Fee and or New Capital Fee were not otherwise earned and payable hereunder.

As used herein, the term "***Aggregate Consideration***" shall mean the total amount of all cash plus the total value of all securities, contractual arrangements (including, without limitation, any lease arrangements or put or call agreements) or other consideration, paid or payable, directly or indirectly, in connection with a M&A Transaction.

For the avoidance of doubt, the term "***raised***" shall include the amount committed under a definitive agreement or otherwise made available to the Company whether or not such amount (or any portion thereof) is drawn down at closing or is ever drawn down and whether or not such amount (or any portion thereof) is used to refinance existing obligations of the Company, so long as such amount is accepted by the Company.

To the extent the Company requests GHS to perform additional services not contemplated by this Agreement, such additional services and fees therefore as shall be mutually agreed upon by GHS and the Company.

The Company and GHS acknowledge and agree that (i) the hours worked, (ii) the results achieved and (iii) the ultimate benefit to the Company of the work performed, in each case, in

April 11, 2013 DRAFT
Page 6 of 14

connection with this engagement, may be variable, and that the Company and GHS have taken such factors into account in setting the fees hereunder.

Section 5. Expenses.

Without in any way reducing or affecting the provisions of Exhibit A hereto, the Company shall reimburse GHS over the term of the Agreement for its reasonable out-of-pocket expenses incurred in connection with the initiation and performance of its engagement hereunder, and the enforcement of this Agreement, including without limitation the reasonable out-of-pocket fees, disbursements and other charges of GHS' outside legal counsel. GHS' outside legal counsel's fees and expenses will be billed monthly directly to and will be paid monthly directly by the Company. Other expenses shall also include, but not be limited to, reasonable out-of-pocket expenses incurred in connection with travel and lodging, data processing and communication charges, research and courier services.  Upon acceptance of this engagement by GHS, and approval by the Bankruptcy Court, the Company shall pay GHS a refundable cash deposit of $25,000 as an advance against such expenses.

Section 6. Indemnity.

The Company agrees to the provisions of Exhibit A hereto which provide for indemnification by the Company of GHS and certain related persons. Such indemnification is an integral part of this Agreement and the terms thereof are incorporated by reference as if fully stated herein. Such indemnification shall survive any termination, expiration or completion of this Agreement or GHS' engagement hereunder.

Section 7. Term.

The term of GHS' engagement shall extend until the earlier of the confirmation and effectiveness of a Plan or the completion of a Transaction(s) which comprise substantially all of the Company's assets. This Agreement may be terminated by either the Company or GHS after six (6) months, after which the terminating party must provide five (5) days advance notice in writing. If terminated, GHS shall be entitled to payment of any fees which are due and owing to GHS upon the effective date of termination and GHS will be entitled to reimbursement of any and all reasonable expenses described in Section 5. Termination of GHS' engagement hereunder shall not affect or impair the Company's continuing obligation to indemnify GHS and certain related persons as provided in Exhibit A.  Without limiting any of the foregoing, the M&A Fee and/or New Capital Fee, as the case may be, shall be payable in the event that the engagement is terminated by the Company and a  New Capital Raise or  M&A Transaction is consummated prior to the expiration of twelve (12) months after such termination, or a definitive agreement with respect thereto is executed at any time prior to twelve (12) months  after such termination (which definitive agreement subsequently results in the consummation of a Transaction.)

Section 8. Miscellaneous.

(a)    *Administrative Expense Priority*. The Company agrees that GHS' post-petition compensation as set forth herein and payments made pursuant to reimbursement and indemnification provisions of this Agreement shall be entitled to priority as expenses of administration under 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code and shall be entitled to the benefits of any "carve-outs" for professional fees set forth in any order authorizing post-petition financing or use of cash collateral.

(b)      *Survival, Successors & Assigns.* Sections 4 through 7 hereof, inclusive, including the provisions set forth in Exhibit A hereto, shall survive the termination or expiration of this Agreement. The benefits of this Agreement and the indemnification and other obligations of the Company to GHS and certain related persons contained in Exhibit A hereto shall inure to the respective successors and assigns of the parties hereto and thereto and of the indemnified parties, and the obligations and liabilities assumed in this Agreement and Exhibit A by the parties hereto and thereto shall be binding upon their respective successors and assigns.

(c)      *Benefit of Agreement; No Reliance by Third Parties.* The advice (oral or written) rendered by GHS pursuant to this Agreement is intended solely for the benefit and use of the Company and its professionals in considering the matters to which this Agreement relates.

(d)      *Nature of Relationship.* The relationship of GHS to the Company hereunder shall be that of an independent contractor and GHS shall have no authority to bind, represent or otherwise act as agent, executor, administrator, trustee, lawyer or guardian for the Company, nor shall GHS have the authority to manage money or property of the Company. The parties hereto acknowledge and agree that by providing the services contemplated hereunder, GHS will not act, nor will it be deemed to have acted, in any managerial or fiduciary capacity whatsoever with respect to the Company or any third party including security holders, creditors or employees of the Company.

(e)      *GHS Affiliates.* GHS has indirect affiliate relationships with numerous investment banking institutions located worldwide (the "***Affiliated Entities***"). None of the Affiliated Entities is being retained hereunder nor will any professionals or employees of the Affiliated Entities provide services to the Company in connection with the matters contemplated hereby. The Affiliated Entities are involved in a wide range of investment banking and other activities. GHS can make no representation as to the "disinterestedness" (as defined in the Bankruptcy Code) of the professionals or employees of the Affiliated Entities. Information that is held by the Affiliated Entities will not for any purpose be taken into account in determining GHS' responsibilities to the Company hereunder. None of the Affiliated Entities will have any duty to disclose to the Company or any other party, or utilize for the Company's benefit, any non-public information acquired in the course of providing services to any other person engaging in any transaction or otherwise carrying on its business.

(f)      *Required Information.* For your information, GHS may screen the Company against various databases to verify its identity.

(g)      *Public Announcements.* The Company acknowledges that GHS may at its option and expense, after announcement of a Transaction, place announcements and advertisements or otherwise publicize the Transaction in such financial and other newspapers and journals as it may choose, stating that GHS acted as financial advisor to the Company in connection with such Transaction. The Company further consents to GHS' public use or display of the Company's logo, symbol or trademark as part of GHS' general marketing or promotional activities, provided such use or display is in the nature of a public record or tombstone announcement in relation to a Transaction.

(h)      *CHOICE OF LAW: JURISDICTION.* THIS AGREEMENT HAS BEEN NEGOTIATED, EXECUTED AND DELIVERED AT AND SHALL BE DEEMED TO HAVE BEEN MADE IN NEW YORK, NEW YORK.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAWS. REGARDLESS OF ANY PRESENT OR FUTURE DOMICILE OR PRINCIPAL PLACE OF BUSINESS OF THE PARTIES HERETO, EACH SUCH PARTY HEREBY IRREVOCABLY CONSENTS AND AGREES THAT ANY AND ALL CLAIMS OR DISPUTES BETWEEN THE PARTIES HERETO PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL BE BROUGHT IN ANY OF (A) ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF NEW YORK OR (B) THE BANKRUPTCY COURT OR ANY COURT HAVING APPELLATE JURISDICTION OVER THE BANKRUPTCY COURT. BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT. EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION WHICH IT MAY HAVE BASED ON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. THE COMPANY CONSENTS TO THE SERVICE OF PROCESS IN ACCORDANCE WITH NEW YORK LAW, AND AGREES THAT THE GENERAL COUNSEL OF THE COMPANY SHALL BE AUTHORIZED TO ACCEPT SERVICE ON ITS BEHALF.

(i)     *Waiver of Jury Trial*. Each of the parties hereto hereby knowingly, voluntarily and irrevocably waives any right it may have to a trial by jury in respect of any claim upon, arising out of or in connection with this Agreement. Each of the parties hereto hereby certifies that no representative or agent of any other party hereto has represented expressly or otherwise that such party would not seek to enforce the provisions of this waiver. Each of the parties hereto hereby acknowledges that it has been induced to enter into this Agreement by and in reliance upon, among other things, the provisions of this paragraph.

(j)     *Entire Agreement*. This Agreement embodies the entire agreement and understanding of the parties hereto and supersedes any and all prior agreements, arrangements and understandings relating to the matters provided for herein. No alteration, waiver, amendment, change or supplement hereto shall be binding or effective unless the same is set forth in writing signed by a duly authorized representative of each of the parties hereto.

(k)     *Authority*. Each party hereto represents and warrants that it has all requisite power and authority, subject to Bankruptcy Court approval as provided in Section 3 hereof, to enter into this Agreement and Exhibit A and the transactions contemplated hereby. Each party hereto further represents that this Agreement has been duly and validly authorized by all necessary corporate action and has been duly executed and delivered by each of the parties hereto and constitutes the legal, valid and binding agreement thereof, enforceable in accordance with its terms. GHS will assume that any instructions, notices or requests have been properly authorized by the Company if they are given or purported to be given by, or is reasonably believed by GHS to be a director, officer, employee or authorized agent.

(l)     *Counterparts*. This Agreement may be executed in as many counterparts as may be deemed necessary and convenient, and by the different parties hereto on separate counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier or PDF facsimile shall be effective as delivery of a manually executed counterpart to this Agreement.

April 11, 2013 DRAFT
Page 9 of 14

     (m)    *Notices*. Any notice given pursuant to, or relating to, this Agreement shall be in writing and shall be mailed or delivered by courier (a) if to the Company, at the address set forth above, Attn: General Counsel and (b) if to GHS, to Global Hunter Securities, LLC, 400 Poydras Street, Suite 3100, New Orleans, LA 70130, Attn: General Counsel.

     If the foregoing correctly sets forth the understanding and agreement between GHS and the Company, please so indicate by signing and returning the enclosed duplicate copy of this letter, whereupon it shall become a binding agreement between the parties hereto as of the date first above written.

           [Remainder of Page Intentionally Left Blank, Signature Pages Follow]

April 20 , 2013

Very truly yours,

GLOBAL HUNTER SECURITIES LLC

By: _____

Michael H. Schmidt, Managing Director

April __20__, 2013


Accepted and Agreed:

VPR Operating, LLC

By: _____

Exhibit A

The Company shall indemnify and hold harmless GHS and its affiliates, counsel and other professional advisors, and the respective directors, officers, controlling persons, agents and employees of each of the foregoing (GHS and each of such other persons, an "**Indemnified Party**" and, collectively, the "**Indemnified Parties**"), from and against any losses, claims or proceedings, including, without limitation, stockholder actions, damages, judgments, assessments, investigation costs, settlement costs, fines, penalties, arbitration awards and any other liabilities, costs, fees and expenses (collectively, "**Losses**") (a) directly or indirectly related to or arising out of (i) oral or written information provided by the Company, the Company's employees or other agents, which either the Company or an Indemnified Party provides to any person or entity or (ii) any other action or failure to act by the Company, the Company's employees or other agents or any Indemnified Party at the Company's request or with the Company's consent, in each case in connection with, arising out of, based upon, or in any way related to this Agreement, the retention of and services provided by GHS under this Agreement, or any Transaction or other transaction; or (b) otherwise directly or indirectly in connection with, arising out of, based upon, or in any way related to the engagement of GHS under this Agreement or any transaction or conduct in connection therewith, provided that the Company shall not be required to indemnify any Indemnified Party for such Losses if and only to the extent that it is finally judicially determined by a court of competent jurisdiction that such Losses arose primarily because of the gross negligence, willful misconduct or fraud of such Indemnified Party. If multiple claims are brought against an Indemnified Party, with respect to at least one of which indemnification is permitted under applicable law and provided for under this Agreement, the Company agrees that any judgment or award against such Indemnified Party shall be conclusively deemed to be based on claims as to which indemnification is permitted and provided for, except to the extent the judgment or award expressly states that it, or any portion thereof, is based on a claim as to which indemnification is not available.

The Company shall further reimburse any Indemnified Party promptly after obtaining any necessary approval of any Bankruptcy Court, if any, for any reasonable legal or other fees, disbursements or expenses as they are incurred (a) in investigating, preparing, pursuing or settling any action or other proceeding (whether formal or informal) or threat thereof, whether or not in connection with pending or threatened litigation or arbitration and whether or not any Indemnified Party is a party (each, an "**Action**") and (b) in connection with enforcing such Indemnified Party's rights under this Agreement; provided, however, that in the event and only to the extent that it is finally judicially determined by a court of competent jurisdiction that the Losses of such Indemnified Party arose primarily because of the gross negligence, willful misconduct or fraud of such Indemnified Party, such Indemnified Party will promptly remit to the Company any amounts reimbursed under this paragraph.

Upon receipt by an Indemnified Party of notice of any Action, such Indemnified Party shall notify the Company in writing of such Action, but the failure to so notify shall not relieve the Company from any liability hereunder (a) if the Company had actual notice of such Action or (b) unless and only to the extent that such failure results in the forfeiture by the Company of rights and defenses. The Company shall, if requested by GHS, assume the defense of any such Action including the employment of counsel reasonably satisfactory to GHS and will not, without the prior written consent of GHS, settle, compromise, consent or otherwise resolve or seek to terminate any pending or threatened Action (whether or not any Indemnified Party is a party thereto) unless such settlement, compromise, consent or termination (i) contains an express, unconditional release of each Indemnified Party from all liability relating to such Action and the engagement of GHS under this Agreement and (ii) does not include a statement as to, or an admission of fault, culpability or a failure to act by or on behalf of any

Indemnified Party. Any Indemnified Party shall be entitled to retain separate counsel of its choice and participate in the defense of any Action in connection with any of the matters to which this Agreement relates, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless (x) the Company has failed promptly to assume the defense and employ counsel or (y) the named parties to any such Action (including any impleaded parties) include such Indemnified Party and the Company, and such Indemnified Party shall have been advised by counsel that there may be one or more legal defenses available to it which are different from or in addition to those available to the Company; provided that the Company shall not in such event be responsible under this Agreement for the fees and expenses of more than one firm of separate counsel (in addition to local counsel) in connection with any such Action in the same jurisdiction.

The Company agrees that if any right of any Indemnified Party set forth in the preceding paragraphs is finally judicially determined to be unavailable (except by reason of the gross negligence, willful misconduct or fraud of such Indemnified Party), or is insufficient to hold such Indemnified Party harmless against such Losses as contemplated herein, then the Company shall contribute to such Losses (a) in such proportion as is appropriate to reflect the relative benefits received by the Company and its creditors and stockholders, on the one hand, and such Indemnified Party, on the other hand, in connection with the transactions contemplated hereby, and (b) if (and only if) the allocation provided in clause (a) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (a) but also the relative fault of the Company and such Indemnified Party; provided, that, in no event shall the aggregate contribution of all such Indemnified Parties exceed the amount of fees received by GHS under this Agreement. Benefits received by GHS shall be deemed to be equal to the compensation paid by the Company to GHS in connection with this Agreement. Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any other alleged conduct relates to information provided by the Company or other conduct by the Company (or the Company's employees or other agents) on the one hand or by GHS on the other hand.

The Company also agrees that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the Company for or in connection with advice or services rendered or to be rendered by any Indemnified Party pursuant to this Agreement, the transactions contemplated hereby or any Indemnified Party's actions or inactions in connection with any such advice, services or transactions except for and only to the extent that such Losses of the Company are finally judicially determined by a court of competent jurisdiction to have arisen primarily because of the gross negligence, willful misconduct or fraud of such Indemnified Party in connection with any such advice, actions, inactions or services. The Company shall use its best efforts to require, as a condition of the Company releasing from liability any creditor or other party-in-interest in the case, that such creditor or other party-in-interest release all Indemnified Parties from all claims or other liabilities directly or indirectly in connection with, arising out of, based upon, or in any way related to the engagement of GHS under this Agreement or any transaction or conduct in connection therewith, provided that the Company shall not be required to use its best efforts to obtain such release with respect to the gross negligence, willful misconduct or fraud of any Indemnified Party.

The rights of the Indemnified Parties hereunder shall be in addition to any other rights that any Indemnified Party may have at common law, by statute or otherwise. Except as otherwise expressly provided for in this Agreement, if any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and

restrictions contained in this Agreement shall all remain in full force and effect and shall in no way be affected, impaired or invalidated. The reimbursement, indemnity and contribution obligations of the Company set forth herein shall apply to any modification of this Agreement and shall remain in full force and effect regardless of any termination of, or the completion of any Indemnified Party's services under or in connection with, this Agreement.

Neither termination of the Agreement, nor termination of GHS' engagement, nor the filing of a petition under the Bankruptcy Code shall affect these indemnification provisions, which shall hereafter remain operative and in full force and effect.